UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ERIC BURKETT,

           Petitioner,                           Hon. Paul L. Maloney

v.                                        Case No. 1:06-CV-661

CINDI CURTAIN,

           Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Burkett's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Burkett's petition be **denied**.


## BACKGROUND

As a result of events which occurred on or about July 3, 2003, Petitioner was charged with (1) first degree criminal sexual conduct, (2) first degree home invasion, and (3) assault with a dangerous weapon.[1]  (Trial Transcript, January 28, 2004, 5-7).  As detailed below, there were two trials in this matter.  At the conclusion of the initial proceeding, the jury found Petitioner guilty of first degree home invasion, but acquitted him of assault with a dangerous weapon. (Trial Transcript,

_____

[1]  Petitioner was also charged with kidnapping, but that charge was dismissed prior to trial.

1

February 3, 2004, 7-8).  The jury deadlocked on the criminal sexual conduct charge, resulting in a mistrial as to that charge.  (Tr. 6-10).  Petitioner was subsequently retried on the criminal sexual conduct charge.  The relevant portions of the testimony presented at Petitioner's initial trial are summarized below.

**Marieca McCracken**

On the evening of July 2, 2003, McCracken attended a party with some of her friends. (Trial Transcript, January 28, 2004, 139-42).  As of this date, McCracken was intimately involved with both Petitioner and Jeremy West.  (Tr. 142-45).  McCracken left the party in the early morning hours of July 3, 2003.  (Tr. 144).  McCracken and Jeremy West then proceeded to a local liquor store.  (Tr. 145).  While West was in the liquor store, Petitioner telephoned McCracken and told her to "come pick him up."  (Tr. 147-48).  McCracken told Petitioner that she "was busy" and hung up the telephone.  (Tr. 147).  A "minute or two" later, Petitioner telephoned McCracken and told her that she "better come get him now" because he "was gonna be with" her.  (Tr. 147).  McCracken again refused, telling Petitioner that she was going to "be with some friends."  (Tr. 147-48).

McCracken and West returned to McCracken's apartment at approximately 2:15 a.m. (Tr. 146-47).  Shortly before 3:00 a.m. Petitioner kicked down the door to McCracken's apartment. (Tr. 153-54).  Petitioner then entered the apartment and began beating McCracken with his fists. (Tr. 154-55).  Jeremy West told Petitioner to "chill out."  (Tr. 155).  Petitioner told West he "better not get into it" and then made a gesture suggesting that he had a weapon.  (Tr. 155).  Jeremy West then "picked up his things and he left."  (Tr. 156).  Petitioner continued to beat and choke McCracken.  (Tr. 156-58).  As he was beating McCracken, Petitioner told her that he was beating

2

her because she "lied to him" about "being with Jeremy" that night. (Tr. 158).

After beating McCracken still further, Petitioner retrieved a knife from the kitchen and told McCracken that he was going to kill her. (Tr. 158-64). Petitioner took the knife and held it to McCracken's throat until she bled. (Tr. 164-66). Petitioner told McCracken to go into the bathroom because he was going to kill her in the shower. (Tr. 167). After the pair entered the bathroom, Petitioner told McCracken to undress and get into the shower. (Tr. 168). Petitioner then forced McCracken to shower. (Tr. 168-69). Petitioner then located McCracken's telephone and called Jeremy West. (Tr. 171-72). Petitioner told West that he (Petitioner) was "still fucking that bitch" and that he (Petitioner) was "gonna be with" McCracken. (Tr. 172-73).

Petitioner then looked up towards the sky and began having a conversation with his deceased mother. (Tr. 174). Petitioner repeatedly asked his mother whether he should kill McCracken. (Tr. 174). Petitioner then told McCracken that she "was gonna have sex him." (Tr. 175). McCracken told Petitioner, "no," at which point Petitioner cut McCracken's hand with his knife. (Tr. 175). Petitioner then proceeded to force McCracken to have sex with him. (Tr. 175-79). After sexually assaulting McCracken, Petitioner told her that if she left her apartment he would kill her. (Trial Transcript, January 29, 2004, 7-9). Petitioner then told McCracken "that was a lesson that [she] needed to learn." (Tr. 10). Petitioner then departed. (Tr. 10).

Afraid to leave her apartment, McCracken fell asleep. (Tr. 7-9). She awoke the following morning at approximately 8:30 a.m. and telephoned her friend Kalisha Todd. (Tr. 9-13). McCracken then drove to Todd's place of employment. (Tr. 12-13). Todd told McCracken that she should report the incident to the police, but McCracken declined and instead drove to her mother's house. (Tr. 13-14). McCracken's mother also instructed McCracken to report the matter to the

3

police.  (Tr. 14-15).  Petitioner agreed and drove to a nearby police station and reported the incident

to Officer Carol Graham.  (Tr. 15-16).  After providing her statement to the police, arrangements

were made for McCracken to undergo a physical examination.  (Tr. 16-20).

**Jeremy West**

On the evening of July 2, 2003, West attended a party where he encountered Marieca

McCracken.  (Trial Transcript, January 29, 2004, 105-07).  West and McCracken later left the party

and proceeded to a nearby liquor store, where West purchased alcohol.  (Tr. 107-08).  The pair then

returned to McCracken's apartment.  (Tr. 108).

Petitioner later entered the apartment and began fighting with McCracken.  (Tr. 109-

12).  West told Petitioner to "chill out," at which point Petitioner told West to "stay out of this."  (Tr.

112-13).  Petitioner then made a gesture indicating that he had a weapon.  (Tr. 112).  West felt that

it was a "dangerous situation" so he immediately left the apartment.  (Tr. 112-13).  West did not call

911.  (Tr. 114).  Petitioner later telephoned West and told him that "me and him didn't have no

problem with each other" because McCracken "was playing me and playing him."  (Tr. 114).

**Kalisha Todd**

On the morning of July 3, 2003, Todd received a telephone call from Marieca

McCracken.  (Trial Transcript, January 29, 2004, 118-19).  McCracken was crying and sounded

upset.  (Tr. 119).  McCracken later arrived at Todd's place of employment.  (Tr. 118-20).  Todd

observed that McCracken's face was "swelled up" and "bruised."  (Tr. 120).  The pair proceeded

to McCracken's mother's residence, after which they contacted the police.  (Tr. 120-23).

**Sarah Bowerman**

Bowerman is Marieca McCracken's mother.  (Trial Transcript, January 29, 2004, 128-29).  On the morning of July 3, 2003, McCracken telephoned Bowerman.  (Tr. 129-30).  McCracken was crying and her mother could discern from the tone of McCracken's voice that "something very horrible had happened."  (Tr. 130).  McCracken arrived at her mother's house later that morning.  (Tr. 131).  When Bowerman saw her daughter, she immediately observed that McCracken was bruised and bloody all over her body.  (Tr. 131-32).  Bowerman then went with her daughter to the police station.  (Tr. 133).  McCracken never returned to her apartment, but instead immediately moved in with her mother.  (Tr. 135).  Bowerman testified that McCracken suffered significant emotional trauma as a result of her assault.  (Tr. 136-37).

**Suzanne Thorne-Oden**

Oden, a registered nurse, was qualified to testify as an expert in the area of "sexual assault nurse examination and nursing."  (Trial Transcript, January 29, 2004, 145-51).  Oden performed a sexual assault examination on Marieca McCracken on July 3, 2003.  (Tr. 153).  McCracken told Oden that earlier that morning, Petitioner had broken into her apartment, beat her, cut her, and forcibly had sexual intercourse with her.  (Tr. 156-59).  This examination revealed that McCracken had suffered "pretty severe" injuries to her genital area, consistent with "forced penetration."  (Tr. 159-67, 172-73).

**Carol Graham**

As of July 3, 2003, Graham was employed as a Public Safety Officer for the City of

5

Springfield. (Trial Transcript, January 29, 2004, 174-75). Graham interviewed Marieca McCracken at approximately 11:00 a.m. on July 3, 2003. (Tr. 176-77). Graham immediately observed that McCracken was "badly bruised and battered. . .bloody. . .[and] emotionally distraught." (Tr. 177). Graham spoke briefly with McCracken and then arranged for her to be examined by Suzanne Thorne-Oden. (Tr. 178-82).

Graham then proceeded to McCracken's apartment. (Tr. 182-83). Upon her arrival, Graham observed that the door to McCracken's apartment was "badly broken." (Tr. 183). The door "framing was gone," the "strike plates were gone," and "there were splinters. . .scattered across the living room and dining room area." (Tr. 183-84). Graham discovered the knife that Petitioner used in his attack. (Tr. 185-87). Graham also discovered "clumps of what appeared to be human hair" that were consistent with McCracken's hair. (Tr. 187-88). An examination of McCracken's bed revealed blood on the comforter and pillow cases. (Tr. 189-90).

### Aaron Wiersma

As of July 3, 2003, Wiersma was employed as a Calhoun County Deputy Sheriff. (Trial Transcript, January 30, 2004, 6-7). On that date, Wiersma was "working in intake" at the Calhoun County Jail. (Tr. 6-7). Deputy Wiersma processed Petitioner into the jail at approximately 2:30 p.m. that afternoon. (Tr. 7). Wiersma secured Petitioner's clothing as part of the intake process. (Tr. 7-8). Deputy Wiersma observed that Plaintiff looked "healthy" and did not appear to require medical attention. (Tr. 8-10). Petitioner declined an offer for medical treatment and indicated that he was not experiencing any "medical issues." (Tr. 8-9). Wiersma was instructed by the prosecutor's office to place Petitioner in a cell by himself and that he was "not to have any food

6

or water, not to wash himself or have any food until Springfield came and picked him up." (Tr. 10).

**James Pence**

As of July 3, 2003, Pence was employed as a Public Safety Officer for the City of Springfield. (Trial Transcript, January 30, 2004, 14). At approximately 6:00 p.m. Pence arrived at the Calhoun County Jail to transport Petitioner to the Battle Creek Health System so that a search warrant to obtain evidence from Petitioner's person could be executed. (Tr. 14-15). Officer Pence informed Petitioner of his Miranda rights, which Petitioner acknowledged and waived. (Tr. 15-16). Pence was aware that Petitioner had not received food or water since he was processed into the jail earlier that afternoon. (Tr. 16-17). Pence saw no evidence that Petitioner was suffering any ill effect from this circumstance. (Tr. 17). Petitioner neither asked for food or water nor made any comment that caused Officer Pence to believe that Petitioner was suffering any ill effect from his brief deprivation of food and water. (Tr. 17).

While they were waiting at the medical facility, Officer Pence asked Petitioner if he had seen Marieca McCracken between the late evening hours of July 2, 2003, and the early morning hours of July 3, 2003. (Tr. 17-18). Petitioner initially stated that he and McCracken "went to the park together" the previous night. (Tr. 17-18). Petitioner said that he and McCracken had sex at the park. (Tr. 18). Petitioner further stated that McCracken liked "rough sex" and that as a result he "pulled her hair a little bit" during sex. (Tr. 18-19). Petitioner stated that after having sex in the park, he departed for Kalamazoo where he stayed until 7:30 the following morning. (Tr. 19). Officer Pence asked Petitioner if he had gone to McCracken's apartment after having sex with McCracken in the park, to which Petitioner responded that he had not. (Tr. 19-20). Pence then told

7

Petitioner that a witness had stated otherwise.  (Tr. 19-20).  At this point, Petitioner "paused" and then told Pence, "okay, I'll tell you the truth."  (Tr. 20).

Petitioner then told Pence that he had, in fact, gone to McCracken's apartment.  (Tr. 20).  Petitioner stated that when he arrived, McCracken was with another man.  (Tr. 20-21).  Petitioner indicated that he "threw [the other man] out of the apartment," after which he and McCracken began arguing.  (Tr. 21-22).  Petitioner stated that after arguing, he and McCracken had sex.  (Tr. 22).  When asked if they had rough sex, Petitioner responded, "no more rough than usual, no different that usual."  (Tr. 22).  When asked whether he "forced [McCracken] to have sex with him," Petitioner stated that "he don't need to rape anybody because he can get pussy anytime he wants when he wants it."  (Tr. 22).  Petitioner indicated that he wasn't sure what time he left McCracken's apartment, but that it was "light out" when he left.  (Tr. 22).  Petitioner also acknowledged that he was mad when he went to McCracken's apartment the previous night and, furthermore, that he "had a problem with anger."  (Tr. 23).

**Joel Shepperly**

Shepperly testified that he was employed as a laboratory specialist with the Battle Creek Police Department.  (Trial Transcript, January 30, 2004, 38-39).  Shepperly was provided the knife with which McCracken claimed Petitioner assaulted her.  (Trial Transcript, January 28, 2004, 163-64; Trial Transcript, January 30, 2004, 40).  Shepperly tested the knife for fingerprints, but was unable to recover evidence sufficient to permit a positive identification.  (Trial Transcript, January 30, 2004, 40-43).

**Stipulation**

At the close of the prosecution's case in chief, Petitioner and the prosecution stipulated to the following:

> There is a stipulation between the parties that Ann Gordon Forte, an expert in forensic science, tested DNA found on vaginal - vaginal and cervix swabs obtained from Marieca McCracken and compared it with the DNA submitted from Eric Burkett. Her analysis yielded the following results. The DNA recovered from the vaginal and cervix swabs matched the DNA profile obtained from Eric Burkett.
>
> She further concluded by using available population frequency data the probability of selecting a[n] unrelated individual at random having a DNA profile matching the male DNA recovered from Ms. McCracken's swabs is one in 17.8 quadrillion for a Caucasian, one in 4.0 quadrillion for an African-American, and one in 4302 quadrillion for a Hispanic individual.

(Trial Transcript, January 30, 2004, 38-39).


**Jennifer Westover**

Westover encountered Marieca McCracken "a day or so" after Petitioner attacked and assaulted her.  (Trial Transcript, January 30, 2004, 52-54).  Westover testified that McCracken "didn't appear" to be bruised or injured.  (Tr. 53).


**Irma Davis**

Davis testified that she was Petitioner's "auntie" and had known him for more than 20 years.  (Trial Transcript, January 30, 2004, 55-56).  When asked her opinion as to Petitioner's reputation for peacefulness, Davis stated, "he had a temper and we all have a temper, but if we don't have to control it at the time it needs to be controlled that's - sometime it can get out of hand, but

he was not a violent person."  (Tr. 57).

**Sandra Douglas**

        Douglas testified that she has known Petitioner since he was in the sixth grade.  (Trial Transcript, January 30, 2004, 59).   When asked her opinion as to Petitioner's reputation for peacefulness, Douglas responded that

> Mr. Burkett is a bright young man, smart young [man] who has made choices like most young adults have.  And I know him.  I knew his mother.  we were friends and he was raised with good values and along the way children can choose to use those or not use those, but he's been a good person since I've known him.

(Tr. 60).

**Angela Jones**

        Jones has known Petitioner for approximately seven years.  (Trial Transcript, January 30, 2004, 63).   Jones testified that she has never witnessed Petitioner engage in assaultive or threatening behavior.  (Tr. 64).

**Eric Burkett**

        Petitioner testified that he drove to Marieca McCracken's apartment shortly after 2:00 a.m. on the morning of July 3, 2003.  (Trial Transcript, January 30, 2004, 74-76).   Petitioner knocked on the door to McCracken's apartment, after which McCracken answered the door.  (Tr. 76).  Petitioner entered the apartment and saw Jeremy West.  (Tr. 76-77).  Petitioner claimed that McCracken intentionally arranged this encounter in an effort to cause "conflict" between the two

10

men.  (Tr. 77-78).  Petitioner told West, "I don't got no beef with you."  (Tr. 78).  West responded, "I don't got nothing to do with it" and departed.  (Tr. 78).

As soon as West exited the apartment, Petitioner and McCracken began arguing.  (Tr. 78-79).  Petitioner accused McCracken of "lying about what she's going to do."  (Tr. 78). According to Petitioner, McCracken was upset because Petitioner "was with another girl." (Tr. 79). Petitioner testified that McCracken then began to "swing" at him.  (Tr. 80).  Petitioner attempted to exit the apartment, but McCracken blocked the doorway and prevented him from leaving.  (Tr. 80-81).  Petitioner then grabbed McCracken's arm and "pushed" her away.  (Tr. 81).  Petitioner and McCracken then began "shoving" each other.  (Tr. 82).  Petitioner acknowledged that he also slapped McCracken.  (Tr. 82).  According to Petitioner, after arguing for a short period of time he and McCracken had consensual sex.  (Tr. 84-85).  Petitioner then fell asleep.  (Tr. 86-87). According to Petitioner, he awoke the next morning and returned home.  (Tr. 87-88).

Petitioner was arrested later that afternoon, at approximately 2:00 p.m.  (Tr. 88-89). Petitioner was transported to the jail and placed in a cell without running water.  (Tr. 89).  Petitioner testified that his requests for food were denied.  (Tr. 90).  At approximately 8:30 p.m. that evening, Petitioner was transported to a local hospital so that a search warrant could be executed.  (Tr. 90-91). According to Petitioner, after arriving at the hospital Officer Pence informed him of his Miranda rights.  (Tr. 93).  Petitioner declined to speak with Pence.  (Tr. 93).  Petitioner denied telling Pence that he and McCracken had sex in a park earlier on the night in question.  (Tr. 94).  Petitioner denied telling Pence that he and McCracken engaged in rough sex.  (Tr. 94).  According to Petitioner, he was not transported back to the jail until approximately 11:00 p.m., at which time he was finally offered food and water.  (Tr. 97).

11

On cross-examination, Petitioner denied damaging the door to McCracken's apartment. (Tr. 103). Petitioner claimed that McCracken broke the door to her own apartment two years previously and that it had gone unrepaired since. (Tr. 103-04). When Petitioner was shown a photograph which depicted injuries that McCracken suffered during his attack, Petitioner responded that McCracken "didn't look like that" when he left McCracken's apartment on the morning of July 3, 2003. (Tr. 105-06).

**Joey Young**

Young testified that he has known Petitioner "since sixth or seventh grade." (Trial Transcript, February 2, 2004, 4-5). When asked his opinion as to Petitioner's reputation for peacefulness, Young responded that

> He can get - he can get worked up. seen him get worked up [on the] basketball court, but, you know, not enough to actually want to swing on somebody or something like that. He manage [a] certain level of self-control at all times. Most stuff like that he brushes off. Goes - goes on about his business.

(Tr. 5).

Following the presentation of evidence, the jury found Petitioner guilty of first degree home invasion, but acquitted him of assault with a dangerous weapon. (Tr. 7-8). The jury deadlocked on the criminal sexual conduct charge, resulting in a mistrial as to that charge. (Tr. 6-10). On March 2, 2004, a second trial began on the criminal sexual conduct charge. With the exception of Sandra Douglas, all of the people that testified at Petitioner's first trial testified at the second trial, providing testimony that was in all relevant respects identical to their previous testimony. (Dkt. #25-29). Additionally, the prosecution presented testimony from four additional

12

witnesses and Petitioner presented evidence from one additional witness.  The relevant portions of this additional testimony are summarized below.

**Mark Mikolajczyk**

As of July 4, 2003, Mikolajczyk was employed as a Public Safety Officer for the City of Springfield.  (Trial Transcript, March 3, 2004, 152).  On this date, Officer Mikolajczyk took photographs of Petitioner's right hand to document an injury he suffered.  (Tr. 152-54). Mikolajczyk testified that Petitioner had suffered a puncture wound to his hand, consistent with having been bitten.  (Tr. 153-56).

**Dr. Randall Haugen**

Dr. Haugen testified that he was employed as a psychologist at Battle Creek Counseling.  (Trial Transcript, March 4, 2004, 59-60).  Dr. Haugen was permitted to testify as an expert in the areas of general psychology and post-rape behavior.  (Tr. 61-64).

Dr. Haugen testified that it was not uncommon for a victim of forcible rape to fall asleep following the crime.  (Tr. 69).  The doctor testified that victims of rape "generally" delay "a long time" before reporting the matter to the police.  (Tr. 70).  Dr. Haugen characterized the delay between the time McCracken was raped and when she reported it to the police as "a fast delay."  (Tr. 70).  Dr. Haugen testified that it is common for "trauma victims" to seek out friends or family before reporting the matter to the police.  (Tr. 70-71).

13

**Dr. Robert Prodinger**

Dr. Prodinger testified that he was employed as a physician with Battle Creek Emergency Physicians.  (Trial Transcript, March 4, 2004, 80-81).  Dr. Prodinger was permitted to testify as an expert in the field of emergency medicine.  (Tr. 82).

Dr. Prodinger participated in collecting pubic hair, blood, and genital swabs from Petitioner, pursuant to a search warrant, on July 3, 2003.  (Tr. 83-84).  As part of this process, the doctor offered to conduct a "medical screening examination," which Petitioner refused.  (Tr. 84).  Dr. Prodinger testified that Petitioner "was in no physical distress."  (Tr. 84).  When shown pictures of McCracken's injuries, the doctor testified that it would have required "a moderate amount of force, probably multiple times" to cause such damage.  (Tr. 90-91).

**Ann Gordon**

Gordon testified that she was employed by the Michigan State Police as a Forensic Scientist.  (Trial Transcript, March 4, 2004, 99).  Gordon was permitted to testify as an expert in the areas of genetic testing and associated statistical analysis.  (Tr. 99-100).  Gordon testified that DNA located on vaginal and cervical swabs obtained from Marieca McCracken matched Petitioner's DNA profile.  (Tr. 101-08).  Gordon further testified that the probability of another African-American possessing Petitioner's DNA profile was 1 in 4.9 quadrillion.  (Tr. 108-09).

**Armand Hudson**

Hudson testified that he has known Petitioner for "three or four years."  (Trial Transcript, March 4, 2004, 141).  When asked his opinion as to Petitioner's reputation for

14

peacefulness, Hudson responded that

> Eric is a laid-back person, you know what I'm saying? He just - and
> when we played basketball, it was like everybody had their egos, and
> we play sports, and everybody showed their aggression in some
> sports. But outside the sports, on the everyday basis, he just laid
> back, calm, cool, collect[ed].

(Tr. 143).

Hudson testified that he encountered Marieca McCracken at a gas station sometime

the previous year. (Tr. 144-45). Hudson was unsure when this encounter occurred, but thought that

"it might have been in July." (Tr. 144-45). According to Hudson, McCracken laughed at him and

said, "now look where your boy at, look where your boy at." (Tr. 145-46). Hudson testified that

he encountered McCracken on another occasion when she engaged in similar behavior. (Tr. 146-

47). Hudson did not relate when this latter incident allegedly occurred.

Following the presentation of evidence, the jury found Petitioner guilty of first degree

criminal sexual conduct. (Trial Transcript, March 10, 2004, 3). Petitioner was sentenced to

consecutive prison sentences of 5-20 years for home invasion conviction and 17-30 years for

criminal sexual conduct. (Sentencing Transcript, March 26, 2004, 31). Petitioner appealed his

conviction to the Michigan Court of Appeals, asserting the following claims:

> I.     Defendant was denied his due process right to a fair
>        trial when his involuntary statement to police was
>        introduced against him at trial as substantive evidence
>        of guilt.
>
> II.    The trial court erred by admitting the testimony of
>        Randall Haugen as an expert on "post-rape behavior,"
>        because: (1) Haugen offered "profile" evidence which
>        implicitly vouched for the credibility of complainant
>        and was more prejudicial than probative; (2) the trial
>        court erroneously applied a "first-out rule" and this
>        harmed the defense; and (3) the trial court should

15

have at least offered a cautionary instruction as
requested by the defense.

III.   Defendant is entitled to resentencing on the criminal
sexual conduct charge because the guidelines cell he
was sentenced under is based upon facts not proven to
a jury beyond a reasonable doubt.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Burkett,*

No. 254996, Opinion (Mich. Ct. App., Sept. 29, 2005). Asserting the same claims, Petitioner moved

in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave

to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this

Court." *People v. Burkett*, No. 129951, Order (Mich., April 28, 2006). On September 13, 2006,

Petitioner initiated the present action, asserting the same three issues identified above.

## **STANDARD OF REVIEW**

Burkett's petition is subject to the provisions of the Antiterrorism and Effective Death

Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive

standards for granting habeas relief under the following provisions:

(d)   An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court
shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless
the adjudication of the claim —

(1)   resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of
the United States, or

(2)   resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

16

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court

17

unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo*

18

standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.          Petitioner's Statements to Officer Pence**

As discussed above, Officer Pence testified that on July 3, 2003, he transported Petitioner to a local medical facility so that DNA evidence could be collected from Petitioner. Pence testified that while he and Petitioner waited for the necessary medical procedures to be conducted, he questioned Petitioner about the events which led to his arrest. Officer Pence testified as to Petitioner's responses to his questions. Petitioner asserts that admission of this testimony violated his right to due process because his statements to Pence were not voluntarily made.

Prior to trial, Petitioner moved to suppress the statements he made to Officer Pence. The trial court conducted a hearing on the matter. Several people testified at this hearing, the relevant portions of which are summarized below.

**Carol Graham**

Officer Graham testified that on the afternoon of July 3, 2003, she drafted a search warrant for the purpose of obtaining "bodily evidence" from Petitioner concerning his involvement in the sexual assault of Marieca McCracken. (Hearing Transcript, November 24, 2003, 5-7). Graham testified that given the nature of the crime, she was concerned that certain evidence "could be compromised by [Petitioner] with regard to washing, washing off anything that might be on his person or his body." (Tr. 6). Given this concern, Diedre Ford, an assistant prosecuting attorney, informed Graham that she "would have the water turned off in [Petitioner's] cell." (Tr. 11). A

19

magistrate signed Graham's request for a search warrant at approximately 6:00 p.m. that evening, at which point Officer Graham returned to the police station to enlist other officers in the execution of the search warrant.  (Tr. 7-9).

**Deidre Ford**

As of July 3, 2003, Ford served as an assistant prosecuting attorney for Calhoun County.  (Tr. 13).  Ford spoke with Officer Graham that afternoon regarding Graham's efforts to secure a search warrant.  (Tr. 13-14).  Ford suggested to Graham that she "seek a search warrant which would have included a pen[ile] swab."  (Tr. 16).  Ford was also concerned "that if the defendant was placed in a holding cell and had access to water that he may be able to wash himself."  (Tr. 14).  Ford was "specifically concerned with the defendant washing his penis."  (Tr. 16).  Accordingly, Ford contacted the jail in which Petitioner was being held and instructed jail officials to prevent Petitioner from having "access to water in his cell," so as to prevent "the potential of destruction of forensic evidence."  (Tr. 14-18).  Ford did not instruct jail officials to withhold food from Petitioner.  (Tr. 15).

**Ann Everett**

As of July 3, 2003, Everett was employed by the Calhoun County Sheriff's Department as a Sergeant in the "jail division."  (Tr. 19).  Sometime before 3:00 p.m. that afternoon, Deidre Ford contacted her and requested that Petitioner be held "in a cell separate from any other individuals where he would not be able to wash any evidence."  (Tr. 20).  Sergeant Everett then authorized jail officials "to place [Petitioner] in the cell by himself and we turned off the water so

20

that he would not be able to run any water in that cell." (Tr. 20). The cell into which Petitioner was placed did, however, have a toilet in which water was located. (Tr. 25). Ford did not ask Everett to withhold food from Petitioner and Everett did not instruct her staff to withhold food from Petitioner. (Tr. 20-21).

**Aaron Wiersma**

Deputy Wiersma testified that on July 3, 2003, he was working as the "book in officer" at the Calhoun County Jail. (Tr. 27). At approximately 3:00 p.m. that afternoon, Wiersma booked Petitioner into the jail. (Tr. 27-29). As part of the booking process, Deputy Wiersma assessed Petitioner's physical condition and concluded that he was not suffering "any signs of physical illness or complications." (Tr. 29). Wiersma also asked Petitioner "what his medical or physical condition was," in response to which Petitioner stated simply that "he was allergic to dairy products." (Tr. 29). Petitioner did not indicate that he was hungry or that he needed anything to drink. (Tr. 31). Deputy Wiersma testified that Petitioner "looked like a healthy man." (Tr. 30-31). Wiersma was instructed to place Petitioner "in a cell by himself due to the change not to have any access to water." (Tr. 31).

Wiersma also testified that "I believe another supervisor on next shift said not to give [Petitioner] any food." (Tr. 31). Petitioner was not given food during the 4:00 p.m. meal, but his food was saved with instructions that when he returned from the hospital "he was to be fed and placed in a regular cell with water." (Tr. 32). Wiersma testified that Petitioner was transported from the jail to the hospital at approximately 8:30 p.m. that evening. (Tr. 34). Wiersma testified that Petitioner returned from the hospital at approximately 11:15 p.m. (Tr. 33). Between the time he was

21

booked into the jail and was transported to the hospital, Petitioner never requested that he be given food or water.  (Tr. 36).

**James Pence**

Officer Pence testified that he arrived at the Calhoun County Jail at approximately 8:00 p.m. on the evening of July 3, 2003, to transport Petitioner to the hospital.  (Tr. 37-38).  Pence was aware that "they did not want [Petitioner] to have access to water" because "they didn't want [Petitioner] to be able to clean himself."  (Tr. 48).  Pence testified that once he and Petitioner arrived at the hospital they had to wait approximately two hours before medical personnel could attend to Petitioner.  (Tr. 38-39).  During the time they waited, Petitioner never indicated that he needed food or water.  (Tr. 39).  Pence testified that Petitioner did not appear to be suffering from "dehydration or any medical symptom."  (Tr. 39).

Officer Pence testified that when "I realized that we were gonna be there for a while, I figured I might as well read [Petitioner] his rights and see if he had anything to say."  (Tr. 43). Before questioning Petitioner, Pence advised Petitioner of his Miranda rights.  (Tr. 40).  Petitioner acknowledged that he understood his rights and agreed to waive his rights and speak with Officer Pence.  (Tr. 40).  Pence testified that he did not employ any type of force, coercion, trickery, or deceit when he questioned Petitioner.  (Tr. 41).  Pence testified that Petitioner did not appear to be confused or experience difficulty answering any of his questions.  (Tr. 41-42).  Petitioner appeared to understand Pence's questions and freely and voluntarily responded thereto.  (Tr. 42).  Officer Pence testified that he and Petitioner departed the hospital between 10:30 p.m. and 11:00 p.m.  (Tr. 46-47).

**Eric Burkett**

Petitioner testified that while he was waiting to be transported to the hospital, he was hungry and thirsty. (Tr. 52-53). Petitioner testified that he requested food and water, but that his requests were denied. (Tr. 52-53). Petitioner acknowledged that Officer Pence informed him of his Miranda rights while they were at the hospital, but denied that he agreed to speak with Pence. (Tr. 54). According to Petitioner, he told Pence that he "had nothing to say to him." (Tr. 54). When asked "what did Pence do next?," Petitioner offered the following response:

> Then he tried to comfort me in a way to say well, you know, you're being charged with some serious charges here. Looking at life which I just found [out] about those charges at that time, and he could - he would - he done helped other people go through this and if I just tell him a few things he can help me out of the situation. Don't look at him as an officer. Look at him as somebody that's trying to help me out of a situation basically is what he was saying to me.

(Tr. 54-55).

Petitioner testified that Officer Pence also told him that he was guilty of the crime, which angered Petitioner. (Tr. 55). According to Petitioner, despite informing Pence that he did not want to talk, Pence continued to question him. (Tr. 55). Petitioner testified that while they were waiting at the hospital, Officer Pence allowed him to walk to a water fountain and get a drink of water. (Tr. 56).

The trial judge denied Petitioner's motion to suppress, concluding that Petitioner voluntarily waived his right to remain silent. (Hearing Transcript, November 24, 2003, 62-64). The Michigan Court of Appeals affirmed the trial court's ruling on this issue, also concluding that Petitioner voluntarily waived his right to remain silent. *People v. Burkett,* No. 254996, Opinion at 4 (Mich. Ct. App., Sept. 29, 2005). The determination by the trial judge and the Michigan Court of

Appeals that Petitioner voluntarily waived his right to remain silent is contrary to clearly established federal law as established by the United States Supreme Court.  Specifically, the Michigan courts erred by analyzing Petitioner's motion to suppress pursuant to an improper standard.

As noted above, at the hearing on Petitioner's motion to suppress, Officer Pence testified that after he informed Petitioner of his Miranda rights, Petitioner waived his right to remain silent and agreed to answer his questions.  Petitioner, on the other hand, testified that he told Pence that he "had nothing to say to him."  While the trial judge denied Petitioner's motion to suppress, he found as a factual matter that Petitioner told Pence that he did not want to answer his questions.  (Hearing Transcript, November 24, 2003, 64).  Likewise, the Michigan Court of Appeals stated that "[t]he trial court found that despite apparently asserting his right to remain silent, defendant did answer questions."  *People v. Burkett,* No. 254996, Opinion at 4 (Mich. Ct. App., Sept. 29, 2005).

Despite finding that Petitioner invoked his right to remain silent, the trial court concluded that Petitioner's statements to Officer Pence were admissible because (1) Petitioner failed to request an attorney; (2) Petitioner, despite stating that he did not want to answer any questions, answered Pence's questions anyway; and (3) Officer Pence did not make any specific promises to Petitioner to get him to speak.  The Michigan Court of Appeals affirmed the trial judge's determination, concluding that Petitioner "was provided *Miranda* warnings, and was not forced or coerced into speaking with the police."  The determination by the state courts that Petitioner's statements to Officer Pence were admissible is contrary to clearly established federal law.  Specifically, as discussed below, the state courts improperly analyzed this issue as a "voluntariness" issue rather than examining whether Petitioner's Miranda rights had been violated.

In *Michigan v. Mosely*, 423 U.S. 96 (1975), the Supreme Court analyzed whether

24

statements obtained following an individual's invocation of his right to remain silent were admissible. Mosely was arrested in the "early afternoon" of April 8, 1971, for his alleged involvement in a series of robberies. *Id.* at 97. Petitioner was arrested by Detective Cowie, who immediately transported Mosely to a police station. After informing Mosely of his Miranda rights, Cowie began questioning Mosely about the robberies in question. Mosely informed Cowie that "he did not want to answer any questions," at which point Cowie "ceased the interrogation." *Id.*

Several hours later, Detective Hill sought to question Mosely about the recent killing of a man named Williams. *Id.* at 97-98. Before questioning Mosely, Hill informed Mosely of his Miranda rights. *Id.* at 98. Mosely did not refuse to answer Hill's questions and instead made statements implicating himself in the killing. Mosely was subsequently charged with first-degree murder. *Id.* Prior to trial Mosely moved to suppress his statements to Detective Hill "on a number of grounds, among them the claim that under the doctrine of the Miranda case it was constitutionally impermissible for Detective Hill to question him about the Williams murder after he had told Detective Cowie that he did not want to answer any questions about the robberies." *Id.* at 98-99.

The trial court denied Mosely's motion and Mosely was convicted of first degree murder. *Id.* at 99. The Michigan Court of Appeals reversed Mosely's conviction on the ground that "Detective Hill's interrogation of Mosely had been a per se violation of the Miranda doctrine." After failing to obtain relief in the Michigan Supreme Court, the State filed a petition for writ of certiorari with the United States Supreme Court, which agreed to hear the matter. *Id.*

At the outset, the *Mosely* Court observed that in *Miranda v. Arizona*, 84 U.S. 436 (1966), the Court "promulgated a set of safeguards to protect the. . .constitutional rights of persons subjected to custodial police interrogation" and that, therefore, "unless law enforcement officers give

certain specified warnings before questioning a person in custody, and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a defendant at trial, *even though the statement may in fact be wholly voluntary*." *Mosely*, 423 U.S. at 99-100 (citing *Michigan v. Tucker*, 417 U.S. 433, 443 (1974)) (emphasis added).

The *Mosely* Court then identified the issue before it as "whether the conduct of the Detroit police that led to Mosely's incriminating statement did in fact violate the Miranda 'guidelines,' so as to render the statement inadmissible in evidence against Mosely at his trial." *Id.* at 100. The Court further observed that resolution of this question "turns almost entirely on the interpretation of a single passage in the Miranda opinion, upon which the Michigan appellate court relied in finding a per se violation of Miranda:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id.* at 100-01 (quoting *Miranda*, 384 U.S. at 473-74).

While recognizing that this passage mandates that "the interrogation must cease" when a suspect indicates that "he wishes to remain silent," the *Mosely* Court observed that it "does not state under what circumstances, if any, a resumption of questioning is permissible." *Id.* at 101. With respect to this question, the Court noted:

> The passage could be literally read to mean that a person who has

26

invoked his "right to silence" can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize "any statement taken after the person invokes his privilege" as "the product of compulsion" and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.

It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

*Mosely*, 423 U.S. at 101-03.

The *Mosely* Court observed that the "intention" of the Miranda decision was "to adopt 'fully effective means. . .to notify the person of his right of silence and *to assure that the exercise of the right will be scrupulously honored*." *Id.* at 103 (quoting *Miranda*, 384 U.S. at 479) (emphasis added). The Court continued that "[t]he requirement that law enforcement authorities must respect a person's exercise of [the right to remain silent] counteracts the coercive pressures of the custodial setting." *Mosely*, 423 U.S. at 104. Accordingly, the *Mosely* Court concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends

under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.*

While the *Mosely* Court did not articulate a bright-line rule for determining whether this standard has been satisfied, the Court did provide guidance on the question by observing that law enforcement officials "fail[ ] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105-06; *see also*, *Fleming v. Metrish*, 556 F.3d 520, 528-29 (6th Cir. 2009) (quoting *Mosely*, 423 U.S. at 105-06).

The *Mosely* Court found that Mosely's statements were admissible because "his 'right to cut off questioning' was fully respected." *Mosely*, 423 U.S. at 104. Specifically, the Court noted that Mosely had been informed of his Miranda rights by Detective Cowie and that as soon as Mosely indicated that he did not want to discuss the robberies in question, Cowie immediately ended his questioning. *Id.* More than two hours passed before Petitioner was questioned by Detective Hill, who likewise advised Petitioner of his Miranda rights. *Id.* at 104-05. Also, Hill did not "resume" Detective Cowie's interrogation concerning Petitioner's involvement in certain robberies, but instead questioned Petitioner about an entirely separate matter. *Id.* at 105. The Court found that Detective Hill's "questioning of Mosely about an unrelated homicide was quite consistent with a reasonable interpretation of Mosely's earlier refusal to answer any questions about his robberies." *Id.*

The present circumstance is, however, quite distinct and establishes that Petitioner's Miranda rights were violated and that his statements to Officer Pence were inadmissible. As previously noted, the trial court and appellate court found that despite being informed by Petitioner that he did not want to answer any of his questions, Officer Pence continued to question Petitioner

about the events leading to his arrest.  Whether Officer Pence actually coerced Petitioner to answer his questions, as noted above, is not relevant.  In sum, the determination by the state courts that Petitioner's statements to Officer Pence were admissible is contrary to the Supreme Court authority discussed above.

This conclusion does not, however, terminate the inquiry.  To obtain habeas relief, Petitioner must also establish that the error in question was not harmless.  *See Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008) (recognizing that errors involving the admission of evidence in violation of Miranda are subject to harmless error analysis).  In the context of a petition for writ of habeas corpus, an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  *Fry v. Pliler*, 127 S.Ct. 2321, 2325-28 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).  This requires Petitioner to demonstrate that he suffered "actual prejudice" resulting from a constitutional error.  *See Brecht*, 507 U.S. at 637.  Petitioner cannot make the requisite showing.

Petitioner was convicted of home invasion and criminal sexual conduct.  With respect to the home invasion conviction, Marieca McCracken and Jeremy West both testified that Petitioner was present in McCracken's apartment in the early morning hours of July 3, 2003.  Petitioner acknowledged this when he testified at trial.  There was, therefore, no dispute as to whether Petitioner entered or was present in McCracken's apartment.  Instead, the issue was whether Petitioner entered the apartment without permission with the intent to commit a felony.  *See People v. Littlejohn*, 2003 WL 21210239 at *2 (Mich. Ct. App., May 22, 2003).  With respect to this issue, Officer Pence testified that Petitioner stated to him that McCracken "allowed him" to enter her apartment.  (Trial Transcript, January 30, 2004, 21).  In other words, Petitioner's statements to

Officer Pence were not inculpatory or prejudicial in nature. Thus, as regards Petitioner's conviction for home invasion, admission of his statements to Officer Pence did not have a "substantial and injurious effect or influence in determining the jury's verdict." Admission of such statements was, therefore, harmless.

As for Petitioner's conviction for criminal sexual conduct, the result is the same. Forensic evidence established that Petitioner had sex with McCracken in the early morning hours of July 3, 2003, as McCracken testified. Petitioner likewise testified that he had sex with McCracken that morning. The question, therefore, was not whether Petitioner and McCracken had sex, but whether their sexual encounter was consensual. With respect to this issue, Officer Pence testified that Petitioner asserted that the sex was consensual and that he did not need to rape anybody because he can get sex "anytime he wants when he wants it." (Trial Transcript, January 30, 2004, 22). Again, Petitioner's statements to Officer Pence concerning this issue were not inculpatory or prejudicial in nature. Thus, as regards Petitioner's conviction for criminal sexual conduct, admission of his statements to Officer Pence did not have a "substantial and injurious effect or influence in determining the jury's verdict." Admission of such statements, therefore, was harmless.

In sum, the Court concludes that the state courts improperly determined that Petitioner's statements to Officer Pence were admissible. The Court further concludes, however, that the admission of these statements constituted harmless error. Accordingly, the Court recommends that this claim raises no issue upon which habeas relief may be granted.

## II.          Dr. Haugen's Testimony

Petitioner asserts that the trial court erred by permitting Dr. Haugen to testify.

30

Specifically, Petitioner asserts that presentation of this evidence was improper because (1) Dr. Haugen vouched for McCracken's credibility; (2) the trial court applied a "first out rule"; and (3) the trial court declined to provide a cautionary instruction.

Petitioner can obtain habeas relief only if he demonstrates that his conviction violates the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). This particular claim cannot form the basis of habeas relief because Petitioner has not asserted that the admission of Dr. Haugen's testimony violates *federal* law. Instead, Petitioner asserts only that the admission of this evidence violates state law. Moreover, even if Petitioner's claim is interpreted as asserting that the admission of Dr. Haugen's testimony violates federal law, the result is the same.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). However, if "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Id.* Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations that violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.*

As the Michigan Court of Appeals correctly observed, Dr. Haugen did not vouch for

McCracken's credibility, but instead testified that her behavior was consistent with that of a trauma victim to rebut Petitioner's claim that McCracken's behavior was inconsistent with her allegations. *People v. Burkett,* No. 254996, Opinion at 4-6 (Mich. Ct. App., Sept. 29, 2005).  The Court fails to discern how such testimony violates a fundamental principle of justice.  Petitioner has identified no authority supporting such a conclusion.

As for Petitioner's claim that the trial judge improperly applied a "first out rule," the result is the same.  Petitioner asserts that pursuant to a local "first out" court rule, the trial judge permitted Dr. Haugen to testify in deference to the determination of another judge (of the same court) who had only the day before found Dr. Haugen's testimony admissible.  In addressing this particular claim, the Michigan Court of Appeals concluded that "[b]ecause [Dr. Haugen's] testimony was properly admitted, the fact that the trial court admitted it pursuant to a local 'first out' rule is irrelevant." *People v. Burkett,* No. 254996, Opinion at 6 n.4 (Mich. Ct. App., Sept. 29, 2005).  The same rationale applies presently.  Because the admission of Dr. Haugen's testimony did not deprive Petitioner of a fair trial, whether such was admitted pursuant to a state evidentiary rule or a local court rule is not relevant.

Finally, as for Petitioner's claim that the trial judge failed to provide a cautionary instruction concerning Dr. Haugen's testimony, such cannot form the basis for habeas relief. Petitioner asserts that the trial judge should have provided a "modified version" of Criminal Jury Instruction 20.29, which provides:

> (1)    You have heard [name expert]'s opinion about the behavior of sexually abused children.

> (2)    You should consider that evidence only for the limited purpose of deciding whether [name complainant]'s acts and words after the alleged crime

were consistent with those of sexually abused children.

(3) That evidence cannot be used to show that the crime charged here was committed or that the defendant committed it.  Nor can it be considered an opinion by [name expert] that [name complainant] is telling the truth.

CJI2d 20.29.

The trial judge rejected Petitioner's request to read to the jury a modified version of

CJI2d 20.29, stating:

I'm going to overrule your objection to using the 20.29.  The reason I do so is that instruction is specifically crafted to relate to children's behavior.

Secondly, no modified instruction was presented to me.  But more importantly I - even if it was modified the only person it could have affected was Randall Haugen, and he really did not testify as it relates to any profile or any kind of child's complainant behavior.  I did not think it could be modified.

In addition, there was the element of mental anguish, mental abuse, so on, related to this.  And all Dr. Haugen did was to testify then in his experience in the field of psychology it would not be unusual for a person who's undergone trauma to do certain things.  And for that reason it was not given.

(Trial Transcript, March 7, 2004, 52-53).

While the trial judge declined to provide a modified version of CJI2d 20.29, he did

instruct the jury concerning expert witness testimony as follows:

You have heard evidence testimony from one or more witnesses who have given his or her testimony as an expert in the field of sexual assault nursing, DNA, emergency room medicine, and psychology.  Experts are allowed to give opinion in court about matters they are experts on.  However, you do not have to believe an expert's opinion.  Instead, you should decide whether you believe it and how important you think it is.  When you decide whether you believe an expert's

opinion, think carefully about the reasons and facts he or she gave for his or her opinion and whether those facts are true.  You should think about the expert's qualifications and whether his or her opinion makes [sense] when you think about all the other evidence in the case.

(Trial Transcript, March 7, 2004, 44).

To obtain habeas relief because of "incorrect jury instructions," Petitioner must establish the instructions were not only erroneous, "but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair."  *Lawrence v. 48th District Court*, 560 F.3d 475, 484 (6th Cir. 2009).

The Michigan Court of Appeals found that while CJI2d 20.29 could have been modified and provided to the jury, that Petitioner's right to a fair trial was not violated.  *People v. Burkett,* No. 254996, Opinion at 6-7 (Mich. Ct. App., Sept. 29, 2005).  As the court recognized, the jury was given a cautionary instruction regarding expert witness testimony.  *Id.* at 7.  The court also observed that Dr. Haugen "was very specific in his direct testimony to say that the presence or absence of any typical behaviors did not indicate that the victim was or was not sexually assaulted."  The court concluded, therefore, that in light of the trial court's instruction, the limited nature of Dr. Haugen's testimony, and the evidence of Petitioner's guilt, the failure by the trial court to provide the requested instruction did not deny Petitioner of a fair trial.  *Id.*

In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented.  As such, this claim presents no issue on which habeas corpus relief may be granted.

III.        *Blakely* **Claim**

In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).  Petitioner asserts that his sentence violates this rule because the sentencing court, in fashioning his sentence, relied upon facts which were neither admitted nor proven beyond a reasonable doubt.

In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm.  *Blakely*, 542 U.S. at 298-99.  In so doing, Blakely admitted "the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts."  *Id.* at 299.  Washington law provided that the "standard range" to which a defendant, convicted of this particular offense, could be sentenced was 49-53 months.  However, the sentencing court was permitted to impose a sentence in excess of the "standard range" if it found "substantial and compelling reasons justifying an exceptional sentence."  Before imposing an "exceptional sentence," the sentencing court was required to "set forth findings of fact and conclusions of law supporting it."  *Id.*

The State recommended that Blakely receive a "standard range" sentence of 49-53 months.  *Id.* at 300.  The sentencing court rejected this recommendation, however, and, finding that Blakely acted with "deliberate cruelty," imposed an "exceptional" sentence of 90 months.  *Id.* at 300-01.  As the *Blakely* Court recognized, under Washington law, the court "could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea," but instead could do so only based on the court's additional determination that Blakely acted with

35

"deliberate cruelty." *Id.* at 304. The Court held, therefore, that this sentence violated Blakely's Sixth Amendment right to trial by jury because it was predicated on facts that were neither admitted by Blakely nor found by a jury. *Id.* at 301-05.

The *Blakely* Court, however, made clear that its holding applied only to "determinate-sentencing schemes" such as that employed by the State of Washington. *Id.* at 308-09. The Court recognized that *indeterminate* sentencing schemes do not run afoul of the Constitution because while such schemes may sanction "judicial discretion" in sentencing, they do not accomplish such "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* at 308-09. As the Court recognized:

> Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence - and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence - and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Id.* at 309.

As is well recognized, the State of Michigan employs an indeterminate sentencing scheme. *See, e.g., Butz v. Berghuis*, 2009 WL 33462 at *3 (W.D. Mich., Jan. 5, 2009) (Maloney, C.J.); *Jenkins v. Harry*, 2009 WL 103991 at *2 (W.D. Mich., Jan. 14, 2009). Petitioner was convicted of first degree home invasion and first degree criminal sexual conduct.

Pursuant to Michigan law, the conviction for first degree home invasion subjected

Petitioner to a sentence of "not more than 20 years."  Mich. Comp. Laws § 750.110a (2003).  The conviction for first degree criminal sexual conduct subjected Petitioner to a sentence of "life or for any term of years."  Mich. Comp. Laws § 750.520b (2003).

Petitioner received consecutive sentences of 5-20 years on the home invasion conviction and 17-30 years on the criminal sexual conduct conviction.  This sentence is entirely consistent with Michigan law, as noted immediately above.  Thus, when Petitioner committed his crimes he knew that he could possibly receive sentences of this magnitude.  Because Petitioner received a sentence within the range permitted by Michigan law as a result of his convictions, any additional fact-finding in which the trial court may have engaged did not violate Petitioner's rights under *Blakely* or the Sixth Amendment.

The Michigan Court of Appeals found this claim to be without merit.  *People v. Burkett,* No. 254996, Opinion at 7-8 (Mich. Ct. App., Sept. 29, 2005).  In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented.  As such, this claim presents no issue on which habeas corpus relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Burkett's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  June 17, 2009

   /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge